IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THOMAS G. BRENNAN, #263642, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:14-cv-1021-TFM |
| | ) | |
| KIM TOBIAS THOMAS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND RULINGS

## I. INTRODUCTION

Plaintiff Thomas G. Brennan ("Brennan") brings this action pursuant to 42 U.S.C. § 1983, claiming that, while he was an inmate of the Draper Correctional Facility ("Draper") in Elmore, Alabama, medical providers were deliberately indifferent to his serious medical needs, and prison officials forced him to work beyond his physical abilities, and they failed to intervene to prevent the alleged violations of the Eighth Amendment and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. Doc. No. 1-1 at 49.[1] Brennan clarified his claims and the defendants, as ordered by the court. Doc. Nos. 117, 118. Brennan names twelve defendants in his clarification, including the following defendants regarding his medical care: Corizon, LLC ("Corizon") which provides medical services to Draper; DyJerlynn Copeland, M.D. (Dr. Copeland"); Michelle Sagers-Copeland, R.N. ("Sagers-Copeland"); Demetric Hicks, C.R.N.P. ("Hicks"); Rich

---

[1] Brennan's complaint is dated June 15, 2014. Doc. No. 1-1 at 46. Brennan filed suit in state court, and the defendants removed it to federal court on October 2, 2014. Doc. No. 1. Brennan is now housed at Bullock Correctional Facility ("Bullock"). Doc. No. 97.

Hallworth, former Chief Executive Officer of Corizon ("Hallworth"); and Stuart Campbell, former Chief Operations Officer of Corizon ("Campbell") (collectively "Medical Defendants"). Doc. No. 118. Brennan names the following Alabama Department of Corrections ("ADOC") officials during the time relevant to the complaint: Kim Thomas, former ADOC Commissioner ("Thomas"); Ruth Naglich, ADOC Associate Commissioner of Health ("Naglich"); Louis Boyd, former ADOC Warden ("Boyd"); Phyllis Billups, ADOC Warden ("Billups"); Larry Philyaw, ADOC Lieutenant ("Philyaw"); and Willie Jackson, ADOC Chief Steward ("Jackson") (collectively "ADOC Defendants"). *Id.* Brennan sued the defendants in their individual and official capacities and listed only money damages in his clarification to the court. Doc. No. 118. Before his clarification in Doc. No. 118, Brennan informed the court that he received a "no-work profile" and "lay in" profile excusing him from work at Bullock, and he informed the court that all claims have been resolved except for the ADA and inadequate medical care and treatment claims. Doc. No. 116. Defendants state all equitable issues have been resolved, and they argue Brennan is not entitled to the monetary relief he seeks. Doc. No. 109.

In accordance with orders of the court, the defendants filed answers, special reports, supplemental special reports, and supporting evidentiary material in response to Brennan's allegations. Doc. Nos. 4, 13, 17, 19, 21, 27, 32, 63, 66, 71, 74, 75, 89, 93, 98, 120. The court informed Brennan that the defendants' special reports may, at any time, be treated as a motion for summary judgment; the court explained the proper manner in which to respond to a motion for summary judgment; and the court directed Brennan to respond to

the defendants' report. Doc. Nos. 37, 76.  Brennan responded.  Doc. Nos. 52, 53, 59, 60, 75, 80, 83, 84, 89, 122.

Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties consented to a United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment. Doc. No. 49.  This case is now pending before the court on the defendants' motions for summary judgment. Upon consideration of the motions, the plaintiff's response to the motions, and the evidentiary materials filed in support and in opposition to the motions, the court concludes that the defendants' motions for summary judgment are due to be granted.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former Fed. R. Civ. P. 56 omitted; "issue" altered to "dispute" to reflect the stylistic change in the current rule). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(alterations added). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to Brennan to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to the case exists. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (court considers facts pled in a plaintiff's sworn complaint when considering his opposition to summary judgment"). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); Fed. R. Civ. P. 56(e). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice . . . ." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Conclusory allegations based on subjective

beliefs are likewise insufficient to create a genuine dispute of material fact. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam). Only disputes involving material facts are relevant, and what is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248. To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation by the court, a pro se litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's pro se status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Brennan fails to demonstrate a requisite genuine dispute of material so as to preclude summary judgment on his claims against the defendants. *See Matsushita*, 475 U.S. at 587.

## III. SUMMARY OF MATERIAL FACTS

Before his transfer to Draper on June 15, 2012, Brennan was an inmate at the St. Clair Correctional Facility ("St. Clair"). While at St. Clair, Brennan filed suit in the United States District Court for the Northern District of Alabama, alleging his Eighth Amendment

rights were violated by a delay in medical diagnosis and treatment, denial of pain treatment and access to physical therapy, and failure of ADOC staff to intervene in his medical care. *See Brennan v. Commissioner, Ala. Dep't Corr.*, 626 F. App'x 939, 941-45 (11th Cir. 2015).[2] Brennan's case in the Northern District is still pending. *Brennan v. Thomas*, 2:13-cv-00152-AKK (N.D. Ala.).

Defendant Rich Hallworth was Chief Executive Officer of Corizon but is no longer employed by Corizon. Doc. No. 32-4, at 2. Corizon has contracts with numerous states, counties, and cities to provide health care to inmates. *Id.* at 3. Hallworth avers he did not oversee the day to day medical care of the inmates across the country, and he never visited Draper or the health care unit at Staton Correctional Facility ("Staton") in Elmore County, Alabama. *Id.* at 2-3. Hallworth states he never had personal communications with Brennan and, if he received communication from him, it would have been forwarded to the appropriate personnel to handle the complaint. *Id.* at 3. Hallworth states he had no communication regarding Brennan's care and no knowledge or input regarding Brennan's health care. *Id.*

---

[3] The Court of Appeals held that Brennan stated a plausible Eighth Amendment claim when Brennan alleged a 34-day delay attributable to a nurse between the time Brennan fell and his first appointment with a general practitioner, during which time Brennan developed a bulge in his neck, and he had pain and lack of movement in his neck, shoulders, arms, lower back, and legs. *Brennan*, 626 F. App'x at 941-42. The Court of Appeals further held Brennan stated a plausible claim for relief when, after he finally saw a doctor who determined he needed treatment, including surgery, it took nearly 4 months for him to receive surgery. *Id.* at 943. It held Brennan stated a plausible claim against medical staff when he alleged he was prescribed pain medication such as Vicodin and muscle relaxants for a period of time, staff knew he was in pain and the proper course of treatment, but staff then limited his pain medications to twice daily instead of three times a day, then later weaned him off narcotics, and then further limited his pain medication. *Id.* at 943-44. It held that Brennan stated a plausible claim when he alleged that, for over 2 months, his pain caused him to be confined to a wheelchair and he received pain medication only occasionally to help him sleep. *Id.* The Court of Appeals allowed Brennan a chance to amend his complaint to raise allegations that might state a plausible claim against the prison wardens, such as their "subjective knowledge of the extent of [Brennan's] medical problems. . . . [or] facts suggesting that either were involved in the decisions related to [Brennan's] diagnosis and treatment, or that they were able to intervene in his medical treatment but refused to do so." *Id.* at 945 (alterations added).

Defendant Stuart Campbell was President and Chief Operating Officer of Corizon but is no longer employed by Corizon. Doc. No. 32-5, at 2. Campbell avers that he did not oversee the day to day medical care of the inmates across the country, and he never visited Draper or the health care unit at Staton. *Id.* at 2-3. Campbell states he never had personal communications with Brennan and, if he received communication from him, it would have been forwarded to the appropriate personnel to handle the complaint. *Id.* at 3. Campbell states he had no communication regarding Brennan's care and no knowledge or input regarding Brennan's health care. *Id.*

Defendant Michelle Sagers-Copeland avers that she is a Registered Nurse (RN") and employed by Corizon as the Health Services Administrator ("HSA") at Staton, and that she administers the Health Care Unit. Doc. No. 32-3, at 2-3. Sagers-Copeland does not provide medical care to inmates and states she had no responsibility or control over the medical care Brennan received at Staton. *Id.* at 3. Sagers-Copeland states that as HSA, she "did not dictate to the medical providers what medical care would have been provided to or recommend or prescribed to Mr. Brennan." *Id.* Sagers-Copeland states she never delayed or denied Brennan medical care, and, to her knowledge, Brennan received nursing care within appropriate standards. *Id.* at 3-4. Sagers-Copeland states that she and Corizon "employees had and have absolutely nothing to do with whether any particular inmate performs a particular job or works in any capacity whatsoever while incarcerated within the" ADOC. Doc. No. 71-1, at 3. She states that no Corizon employee gives work profiles to inmates at Staton or Elmore; instead "[t]he limited profiles may of course limit an inmate from certain work or all work depending on the nature of the limited profile given.

However limited profiles are given and not no-work profiles." *Id.* at 4. Sagers-Copeland states the limited profiles Brennan received from medical personnel were "deemed appropriate given Mr. Brennan's medical condition." *Id.* The ADOC Office of Health Services policy entitled, "Medical Profiles" and dated August 2011, includes a table of guidelines for medical profiles, but "no-work" is not included as a medical profile. Doc. No. 74-4. The policy provides that the guidelines for profiles "are not intended to replace the prescribing authority or ultimate medical decision made by the on-site Provider." *Id.* at 3.

Defendant Demetric Hicks is a Certified Registered Nurse Practitioner ("CRNP"), and worked at Corizon during the time relevant to the complaint. Doc. No. 32-2, at 2. Hicks provided medical care to Brennan in 2013. *Id.* at 3.

Defendant DyJerlynn Copeland avers she is a Medical Doctor who was employed as the Medical Director at Staton from September 8, 2010, through March 11, 2013. Doc. No. 32-1, at 2. Dr. Copeland provided care to Brennan while he was an inmate at Staton beginning in July 2012. *Id.* at 3.

Defendant Kim Thomas was Commissioner of the ADOC. Doc. No. 13-1, at 2. Thomas avers he had no direct or indirect communication with Brennan, and if Thomas received any correspondence from Brennan about his health care, Thomas would have forwarded it to the appropriate health care providers. *Id.* at 3. Thomas states he has never been involved in Brennan's medical care or made any decision related to Brennan's medical care, or had any personal contact with any Corizon or ADOC employee regarding

Brennan's medical treatment, or refused to provide necessary medication attention to Brennan. *Id.* at 3-4.

Defendant Ruth Naglich was Associate Commissioner of Health Services for the ADOC. Doc. No. 13-6, at 2. Naglich avers she never had direct or indirect personal communications with Brennan regarding his health care, and if she received any mail about it, she would have forwarded it to his healthcare providers. *Id.* at 2-3. Naglich avers she never was involved in any medical care regarding Brennan, and all decisions regarding his care were made by Corizon and its employees. *Id.* at 3. Naglich submitted a copy of the ADOC Office of Health Services policy regarding medical profiles in effect on August 2011. Doc. No. 74-4. According to the policy, "assessment of the physical limitation or medical treatment that has facilitated the request for a 'profile' must be documented in the health record in the physician progress notes." Doc. No. 74-4, at 2.

Defendant Louis Boyd was Warden at Draper. Doc. No. 13-2, at 2. Boyd avers he had no involvement in Brennan's medical care and took no part in any decision related to health care issues for Brennan. *Id.* at 3. Boyd states that all medical care decisions are made by Corizon employees, and Boyd had no contact or discussion with them regarding Brennan. *Id.* Boyd states he never refused to provide Brennan medical attention for his medical conditions. *Id.* Boyd further avers that he had no recollection of receiving complaints from Brennan, and that it was common practice for the Warden to direct inmate complaints to the Captain of Security for disposition, as Brennan alleged Boyd did. Doc. No. 63-2, at 1. Boyd denies violating Brennan's federal rights. *Id.* at 1-2.

Defendant Larry Philyaw was a Correctional Officer at Draper when Brennan was there. Doc. No. 13-3, at 2. Philyaw states he was never involved in Brennan's medical treatment and never participated in any decision related to Brennan's health care. *Id.* at 3. Philyaw states Corizon employees made all the decisions related to Brennan's health care, and Philyaw had no contact or discussion with any Corizon employee regarding Brennan's medical treatment or requests. *Id.* Philyaw states he never refused to provide Brennan medical attention for his medical conditions. *Id.* Philyaw also avers that he was unaware of Brennan's physical condition, his job assignment, or his ability to perform particular duties. Doc. No. 63-4, at 1. Philyaw states he does not oversee inmates on their jobs or function as a member of the job assignment board. *Id.* Philyaw states that Brennan never expressed to Philyaw concerns about his job assignment or conditions that would prevent Brennan from doing his job. *Id.* at 1-2. Philyaw denies violating Brennan's federal rights. *Id.* at 2.

Defendant Willie Jackson was employed by the ADOC as Steward III at Draper. Doc. No. 13-4, at 2. Jackson states he was never involved in Brennan's medical treatment and never participated in any decision related to Brennan's health care. *Id.* at 3. Jackson states Corizon employees made all the decisions related to Brennan's health care, and Jackson had no contact or discussion with any Corizon employee regarding Brennan's medical treatment or requests. *Id.* Jackson states he never refused to provide Brennan medical attention for his medical conditions. *Id.* After Brennan was transferred to Draper, he was assigned to kitchen duty on June 20, 2012, as a dining room worker, where he stayed until December 18, 2012. Doc. No. 74-1, at 4-5. Jackson avers that he never told Brennan he did not care how much pain Brennan was in; or that Brennan had to do his job

despite how much damage it would cause Brennan; or that Jackson would not send Brennan back to his room. Doc. No. 63-3, at 1. Jackson avers that if an inmate has a work profile, the kitchen staff follows it, and if an inmate says he has a medical concern but no work profile, Jackson gives the inmate time off to obtain a profile. *Id.* Jackson avers that dining room workers typically "are able to sit down, while waiting for inmates to leave the tables so they can be cleaned. The approximate amount of time Brennan would have performed that duty is between 11/2 hours and 2 hours per day." Doc. No. 74-2, at 1. Jackson further avers that inmates who are cleared for kitchen duty are expected to perform their job, and if the inmate has concerns about the work, the inmate has permission to request a medical profile limiting their work. *Id.* at 2. Jackson states he does not recall Brennan requesting permission from him to get a limited profile, or showing Jackson a profile that would have prevented him from performing his assigned job. *Id.*

Defendant Phyllis Billups was Warden III at Draper until June 2013. Doc. No. 13-5, at 2; Doc. No. 74-5, at 1. Billups states she was never involved in Brennan's medical treatment and never participated in any decision related to Brennan's health care. Doc No. 13-5, at 3. Billups states Corizon employees made all the decisions related to Brennan's health care, and she had no contact or discussion with any Corizon employee regarding Brennan's medical treatment or requests. *Id.* Billups states she never refused to provide Brennan medical attention for his medical conditions. *Id.* Billups avers she never instructed Corizon medical staff to deny Brennan any type of medical treatment or medical limited profile. Doc. No. 74-5, at 1. Billups states she does not play a role in medical assessment of any inmate and has no authority to do so. *Id.* Billups avers that, according to ADOC

policy, ADOC employees must "respect the decisions made by the medical provider when, for example, an inmate is issued a medical profile or not medical cleared for a particular job or housing assignment." *Id.* Billups denies she played any role in getting or denying Brennan's medical profiles, and Billups denies personally refusing to accommodate any profile Brennan had or directing any staff members not to accommodate his medical profile. *Id.* at 2. Billups further avers she does not recall assigning Brennan a job during the job board while at Draper. Doc. No. 63-1, at 2. Billups states that whenever she conducted job board, she was made aware of an inmate medical profile before assigning a job, and she would make accommodations for the profile. *Id.* Billups states that, for an inmate with Brennan's profile who was assigned to the kitchen, the inmate "would have only been assigned to wipe tables. This does not require prolonged standing or prolonged walking. Also the name of any inmates that were assigned to the kitchen was sent to medical for clearance to work there." *Id.*

When Brennan arrived at Draper on June 15, 2012, he was taking Baclofen,[3] Norco,[4] and Ibuprofen[5] for pain, and he had fifteen days of pain medication remaining. Copeland Aff., Doc. No. 32-1, at 3, 28. Brennan sent a request for medical services on June 15 and June 21, 2012. Doc. No. 1-1,[6] at 50. On June 23, 2012, Nurse Lowery prescribed Ibuprofen

---

[3] Baclofen is a muscle relaxant used to decrease muscle spasms and for pain relief. http://medlineplus.gov/druginfo/meds/a682530.html (last visited 8/16/2017).

[4] Norco is a pain reliever combining the opioid hydrocodone and acetaminophen, an analgesic; it is used to treat moderate to severe pain. http://medlineplus.gov/druginfo/meds/a601006.html (last visited 8/16/2017); http://medlineplus.gov/druginfo/meds/a681004.html (last visited 8/16/2017).

[5] Ibuprofen is a nonsteroidal anti-inflammatory drug ("NSAID") used to treat mild to moderate pain. http://medlineplus.gov/druginfo/meds/a682159.html (last visited 8/16/2017).

[6] Doc. 1-1 is 161 pages and consists of the complaint and attachments that Brennan filed in state court. The state court docketing material and the complaint, itself, are 46 pages, and the remaining pages are exhibits attached to the complaint. Many of them are either Brennan's notes to himself or attachments to letters or submissions he made to prison officials and health care providers. Brennan refers to the attachments throughout the complaint. The complaint

for five days. Doc. No. 32-1, at 28. On June 25, 2012, Brennan was treated for an injured elbow and scheduled for July 3, 2012, for review of his medications. Doc. No. 1-1, at 50-53; Doc. No. 32-1, at 101. On June 27, 2012, Brennan submitted a medical grievance to Defendant Sagers-Copeland, and on June 29, 2012, Brennan sent a letter to Corizon, stating his pain medication was about to expire, it needed to be renewed, and that his previous treating physician, Dr. Francavilla, told Brennan he would be on the pain medications for the rest of his life. Doc. No. 1-1, at 54-55.

On June 30, 2012, the prescriptions for Brennan's medications ran out. Brennan states he was in severe pain and experienced withdrawal symptoms when Dr. Copeland stopped the Norco "cold turkey." Doc. No. 1-1, at 14, 24. On July 1, 2012, Brennan wrote to Defendant Warden Boyd, stating that his previous doctor prescribed medication that had expired, stating that Brennan was in extreme pain and experiencing some symptoms of withdrawal, and asking Boyd if he could use his authority to resolve Brennan's problem. Doc. No. 1-1, at 57. Brennan also submitted a request for medical care, stating his injury was "showing itself," and that "to say I'm in pain would be an understatement." Doc. No. 1-1, at 58. Brennan states he also suffered withdrawal symptoms such as muscle spasms, nausea, hot and cold flashes, and insomnia. Doc No. 1-1, at 14, 84-86.

On July 3, 2012, Brennan saw Dr. Copeland, who assessed Brennan with "chronic pain . . . cervical & lumbar issue." Doc. No. 32-1, at 10. Dr. Copeland's notes of the visit

---

is sworn and properly verified under 28 U.S.C. § 1746, and therefore serves as an affidavit under Federal Rule of Civil Procedure 56(c)(4). Doc. No. 1-1, at 46; *see Alsobrook v. Alvarado*, 656 F. App'x 489, 491 (11th Cir. 2016) (citations omitted). To the extent the accompanying exhibits incorporated by reference in the complaint are not otherwise part of the record, the court treats the exhibits as part of Brennan's affidavit.

indicate "Rx meds accordingly" and follow up as needed. *Id.* Brennan states that when he asked for his medications to be renewed, Dr. Copeland said he would not receive those "freeworld" medicines in "my camp"; that those strong medicines were used only "if you have broken bone, cancer, or had surgery"; and that "she would have think about" renewing them for him. Doc. No. 1-1, at 12-14, 58. Brennan states that Dr. Copeland questioned Brennan's previous doctor, stating he "caved in," and that she thought Brennan's chronic pain was all in Brennan's mind. Doc. No. 1-1, at 12-13, 25, 58, 60-61. According to Brennan, he told Dr. Copeland tdhat Lowery mentioned prescribing Ultram[7] instead of Norco, and Brennan said Ultram did not work as well as Norco for him; he said previously the protocol he experienced was to wean him off a narcotic and introduce Ultram, and if that was not followed, Brennan would be in pain. Doc. No. 1-1, at 55. On July 3, 2012, Brennan wrote a letter to Defendant Hallworth about Dr. Copeland's treatment. Doc. No. 1-1, at 63-65.

On July 11, 2012, Dr. Copeland prescribed Brennan Baclofen 20 mg twice a day for sixty days and Ultram 50 mg twice a day for thirty days, and he began receiving them on July 12, 2012. Doc. No. 32-1, at 4, 29. On July 14, 2012, Brennan wrote a note that the prescribed drugs were inadequate and that he would be in pain all day and mostly all night, and that he would let it go on for a short time and then write Hallworth Doc. No. 1-1, at 58. The Ultram ended on August 12, 2012. The Baclofen ended on September 12, 2012.

---

[7] Ultram is a brand name for the drug tramadol, which is in a class of medications called opiate analgesics and used to relieve moderate to moderately severe pain. http://medlineplus.gov/druginfo/meds/a695011.html (last visited 8/16/2017).

Brennan wrote a note that on August 6, 2012, Brennan was called to Defendant Warden Billups's office, where they called Sagers-Copeland to discuss Brennan's grievance to Hallworth about Brennan's meeting with Dr. Copeland for pain medications. Doc. No. 1-1, at 66. According to Brennan, Sagers-Copeland asked who else was in the room when he and Dr. Copeland spoke. Brennan said Lowery and Ms. Flowers, a nurse. When Sagers-Copeland asked if Dr. Copeland prescribed Ultram for Brennan, he cut her off and said Ultram was not working and he needed stronger medicine and a higher dose of Baclofen. The note indicated that Sagers-Copeland said she would talk with people at corporate headquarters and get back to him. Brennan wrote that he was "basically in pain and suffering all day long," and that "she also denied me an egg crate mat. Warden Billups stated I couldn't have one." *Id.* Afterward, Brennan wrote a grievance to Sagers-Copeland, stating he was uncomfortable talking with her while the warden was present. Sagers-Copeland responded that the warden was entitled to be there. Doc. No. 1-1, at 71.

On August 8, 2012, Brennan asked Dr. Copeland to renew the Ultram scheduled to end on August 12, 2012, and to raise the doses of Ultram and Baclofen. Doc. No. 1-1, at 59. The Ultram ended without renewal on August 12, 2012. On August 16, 2012, Brennan submitted a sick call, stating Lowery wanted to see him for chronic pain care, and Brennan noted on September 10, 2012, that he still had not received a response. Doc. No. 1-1, at 73. Brennan wrote a note on August 20, 2012, that without the pain medications, "I'll be in pain and suffering now 24/7." Doc. No. 1-1, at 59. He submitted a sick call request on August 21, 2012, complaining about neck and back pain. Doc. No. 1-1, at 74. Brennan wrote a letter to Hallworth on August 26, 2012, describing his pain, his previous requests

for treatment of his pain, his being forced to stop pain medication cold turkey, his withdrawal symptoms, and stating he did "not know how much more I can take of this." Doc. No. 1-1, at 76.

On September 5, 2012, Brennan states he saw Nurse K. Rice, who said she disagreed with Dr. Copeland's policy on inmates who have pain in their neck, spine, and lower back. Doc. No. 1-1, at 74. Brennan states that Rice "gave me all she could . . . she also gave me 5 days of Tylenol and Ibuprofen." Doc. No. 1-1, at 74. In her affidavit, Dr. Copeland states that Ultram is used for short-term pain relief and "is not designed to be utilized for long-term chronic pain issues. Therefore, in September 2012, Mr. Brennan's prescriptions were changed to Baclofen, Motrin, and Tylenol." Doc. No. 32-1, at 4, 37. Dr. Copeland does not state that she was the person who prescribed the medications on September 5, 2012, and the medical notes indicate the prescriber's initials are "PP." Doc. No. 32-1, at 37. In any event, Brennan received Baclofen, Motrin, and Tylenol, from September 5 through September 11, 2012. When those prescriptions ran out, he received no pain medications for approximately six weeks. Doc. No. 32-1, at 37-38.

During the six weeks Brennan received no pain medications, he sent grievances about his medical care. On September 10, 2012, Brennan wrote Sagers-Copeland, stating he wanted to see a specialist for serious medical issues. Doc. No. 1-1, at 81. On September 21, 2012, Brennan received her response that Brennan had an appointment pending. Doc. No. 1-1, at 82. On October 11, 2012, Brennan wrote Thomas, the DOC Commissioner, a lengthy letter complaining about his medical treatment and being forced to work in the kitchen and not receiving a no-work medical profile. Doc. No. 1-1, at 83-86. Brennan

complained of symptoms such as "muscle spasms, nausea, pain, hot and cold flashes, no sleep, etc." *Id.* at 84. Brennan did not receive a response. *Id.* at 86. On October 14, 2012, Brennan wrote a similar letter to Naglich, the ADOC Commissioner of Health Services. Doc. No. 1-1, at 87-89. Brennan did not receive a response. *Id.*

On October 23, 2012, Brennan saw Nurse Guice for medical care. Doc. No. 32-1, at 11-12. Guice is not a defendant in this action. After examining him, Guice assessed him with "chronic pain stable." *Id.* Brennan told Guice that Ultram helped, and Guice ordered Ultram until Brennan could see a doctor for further pain management. *Id.* at 12. Guice ordered a walking cane profile and noted that Brennan was requesting "work stop," but "no hindrance to work noted." *Id.* Guice added a note that even though Brennan described chronic pain, Guice observed Brennan "ambulating back to Draper Camp with steady gait. No hesitation in movement. Gait speed moderate." *Id.* On October 24, 2012, Brennan began receiving a ten-day prescription for Ultram 50 mg three times a day. Doc. No. 32-1, at 38. According to Brennan, he asked for Ultram 100 mg, and Guice told Brennan she would have to ask Dr. Copeland whether Brennan could receive Baclofen. Doc. No. 1-1, at 82. Brennan also asked for a no-work profile, and, according to Brennan, Guice said Brennan could not have one because everyone at Draper had to work. *Id.* Brennan also filled pit a sick call slip on October 24, 2012, asking to renew his profiles from St. Clair, asking for new orthopedic shoes, and asking to see a doctor about his spine. Doc. No. 1-1, at 90. Brennan noted on the sick call slip that he saw Nurse Geeter on October 26, 2012, who told Brennan she could not give him a medical profile to remove him from the kitchen job, and that he had an appointment with Dr. Copeland on November

4, 2012, regarding pain management. *Id.* Brennan also wrote that he tried talking to Defendant Philyaw about his kitchen job, but Philyaw said he would deal with him on Monday and cussed out Brennan. *Id.*

Brennan finished the course of Ultram on November 2, 2012. Doc. No. 32-1, at 39. On November 5, 2012, Brennan saw Dr. Copeland for complaints of chronic back and neck pain. Doc. No 32-1, at 13. Dr. Copeland noted that Brennan did not cooperate with the exam and acted as if he could not even hold his arm out so she could test his arm and bilateral lower extremity resistance. *Id.* Dr. Copeland refused to approve a new orthopedic shoe for Brennan because the "shoe sole was minimally detaching (I suggest super glue to repair)." *Id.* Dr. Copeland prescribed muscle relaxers, Tylenol, and steroids for Brennan, but not Naproxen, Motrin, Indocen because he said they did not work. *Id.* Medical records indicate Dr. Copeland prescribed Parafon Forte[8] 500 mg and Tylenol 975 three times a day for Brennan. Doc. No. 32-1, at 4, 40. Except for about a week in December 2012, Brennan received Parafon Forte, or Tylenol, and often both, for approximately nine weeks, until to mid-January 2013. Doc. No. 32-1, at 40-43.

Brennan wrote a note that on November 6, 2012, Defendant Chief Steward Jackson forced Brennan to work despite his injured back and neck, even though the other stewards said Brennan should go back to his dorm so he would not get hurt. Doc. No. 1-1, at 92. Brennan wrote a note that on November 14, 2012, the Parafon Forte and Tylenol were doing nothing to relieve his pain. Doc. No. 1-1, at 92. On November 15, 2012, Brennan

---

[8] Parafon Forte is a brand name for the drug chlorzoxazone, which is used to relief pain and stiffness caused by muscle strain. http://medlineplus.gov/druginfo/meds/a682577.html (last visited 8/16/17).

states he sent a note to Warden Boyd that he had the power to order medical staff to give Brennan a no-work profile or remove Brennan from his kitchen job and made a dorm cleaner. Doc. No. 1-1, at 95-96. Brennan states he sent grievances to Boyd, and Sagers-Copeland, who did not respond. Doc. No. 1-1, at 92, 94-101. Captain King, who is not a defendant, responded to the November 15, 2012, note to Boyd, directing Brennan to turn in a medical grievance, informing Brennan that "Warden Billups is over the job board," and stating he had "no authority to force medical to issue you a 'no-work profile.'" Doc. No. 1-1, at 100. Brennan wrote a note that on November 29, 2012, Jackson forced him to work in the kitchen again, wiping down tables, even though the guards could see Brennan was in pain, and Jackson was "laughing at" Brennan. Doc. No. 1-1, at 92. On November 29, 2012, Brennan wrote a sick call request to be removed from work in the kitchen, and he was seen by a nurse on December 3, 2012, who said Nurse Gaudet would see him soon. Doc. No. 1-1, at 105. Brennan wrote a note dated December 5, 2012, that Jackson again forced him to work in the kitchen, even though the other steward asked why Brennan was still there. Doc. No. 1-1, at 93.

At a follow up on December 11, 2018, the medical notes, apparently by Gaudet, indicate to continue Parafon Forte but not to prescribe "NSAIDs" because Brennan said the Motrin, Naprosyn, and Mobic do not help; and the notes indicate Tylenol would continue. The plan indicates to follow up as needed. Doc. No. 32-1, at 14. Brennan also noted that on December 11, 2011, Nurse Gaudet said Brennan would not receive Vicodin or Ultram, that they no longer had Baclofen, and that he would receive Tylenol and Parafon Forte. Doc. No. 1-1, at 93. Brennan noted that Gaudet said Brennan's problems were

related to chronic pain, and Brennan wondered why he was not under "chronic care." Doc. No. 1-1, at 93. Gaudet also denied Brennan a no-work, no standing/prolonged walking profile because "they can't give these types of profiles out." *Id.* She denied him new orthopedic shoes; she could not find his prior CT or MRI scans; and she gave him a profile for no-lifting more than forty pounds yet Brennan wrote he could not life more than ten to fifteen pounds without pain. *Id.* On December 14, 2012, Gaudet ordered Parafon Forte and Tylenol for Brennan for the month beginning on December 18, 2012. Doc. No. 32-1, at 41-43.

On December 12, 2012, Brennan submitted a request to Billups to move from the kitchen job to be a dorm cleaner. Brennan received Billups's response on December 19, 2012, that he would put Brennan on the jobs board. Doc. No. 1-1, at 106. Brennan was moved to the job of dorm cleaner, but he noted it still hurt "to sweep and mop, be on my feet and bending over." *Id.* On December 26, 2012, Brennan wrote a letter to Naglich, recounting his problems with medical care, and requesting to see a specialist. Doc. No. 1-1, at 107-09. Brennan received no response. *Id.*

On January 14, 2013, Brennan asked that Gaudet, his health care provider, renew the Parafon Forte. Doc. No. 1-1, at 111. On January 29, 2013, Brennan was seen for chronic low back pain. Doc. No. 32-1, at 15. Medical records indicate that on January 29, 2013, Gaudet continued Parafon Forte and Tylenol for Brennan. Doc. No. 32-1, at 15. On February 20, 2013, Brennan asked, among other things, to renew his bottom bunk and no prolonged standing profile. Doc. No. 1-1, at 112. For about a week beginning on February

28, 2013, Gaudet added Ultram along with Parafon Forte. Doc. No. 32-1, at 4, 45, 48.[9] On

March 6, 2013, Brennan sent a note to Gaudet, stating, "Thank you for prescribing to me

the adequate pain and muscle relaxer medications. For five days I was able to sleep, eat,

walk, read watch T.V. and do my job as dorm cleaner with little or no pain. I have not

been pain free like that since June 30, 2012." Doc. No. 1-1, at 113.

Dr. Copeland worked at Staton until March 11, 2013. Doc. No. 32-1, at 2. Dr.

Copeland avers that she closely followed Brennan's complaints of pain and "attempt[ed]

to alleviate the pain through pain relief medications that would provide relief without

having difficult side effects." *Id.* at 4. Dr. Copeland avers that "Brennan was a non-

compliant patient who had a history of not showing up for his scheduled appointments to

see the medical providers . . . ." *Id.* at 3. Dr. Copeland states that Brennan received

"numerous special needs limited profile including orthopedic shoes, walking cane, bottom

bunk profile, no prolonged standing and no heaving lifting, due to his complaints of chronic

pain." *Id.* She states that "a variety of nurses and medical providers" repeatedly provided

Brennan medical care. *Id.* Dr. Copeland acknowledges that Brennan "continuously

requested other pain relief medications." *Id.* at 4. She states that, to her knowledge,

Brennan has no medical or pharmacological training, and "[a]s Mr. Brennan's physician I

was attempting to alleviate Mr. Brennan's complaints of chronic pain without

complications from those medications." *Id.* at 3-4. Dr. Copeland states Brennan was not

delayed or denied medical care for pain issues he expressed. *Id.* Copeland states she

---

[9] The medication distribution records list Gaudet as the prescriber, and the initials on the record of the medical visits from December through February are mostly illegible. Doc. No. 32-1, at 14-15, 45-48. The medical records do not include notes of visits from March 2013 through May 2013. They restart with June 24, 2013. Doc. No. 32-2, at 5.

believes her medical care for Brennan met or exceeded the standard of care of physicians in Alabama. *Id.* at 5.

Near the beginning of April 2013, Brennan began regularly receiving Parafon Forte along with Ultram. Doc. No. 32-1, at 52. The prescriptions were authorized by Gaudet. *Id.* In May 2013, Gaudet continued Ultram and Parafon Forte for Brennan. Doc. No. 32-1, at 55. Gaudet also issued Brennan a front of the line profile for thirty days. Doc. No. 58-1, at 22.

Defendant Hicks began treating Brennan for pain in about June 2013. Doc. No. 32-2, at 5-6. Hicks avers that Brennan's medical records indicate that at all relevant times, Hicks conferred with Dr. Bobby Crocker, the Regional Medical Director for Corizon, with regard to pain medications prescribed for Brennan, and that they agreed a combination of Ultram and Parafon Forte were the best medications to treat Brennan's pain. Doc. No. 32-2, at 3. In June 2013, Hicks consulted with Dr. Crocker, and they agreed to continue Ultram twice a day and Parafon Forte. Doc. No. 32-2, at 5-6. Hicks prescribed Brennan Parafon Forte for June 2013 through August 2013; she also prescribed him Ultram in July 2013. Doc. No. 32-1, at 58-64. Brennan received Ultram and Parafon Forte in August 2013, and he continued thereafter to be treated with Ultram and other medications for his chronic pain. Doc. No. 32-1, at 71-89; Doc. No. 32-2; Doc. No. 98-1.

Along with the medical treatment from numerous staff, Hicks and others provided Brennan with medical limited profiles. Doc. No. 58-1; Doc. No. 98-1. Hicks states that "Brennan also received specific special profiles including (1) no prolonged standing (2) no heavy lifting (3) bottom bunk profile and (4) a walking cane." Doc. No. 32-2, at 3. Hicks

states that Brennan's medical needs were never delayed or denied, and that he received the appropriate standard of nursing care. Doc. No. 32-2, at 4.

Dr. Copeland and Hicks are the only medical care providers named as defendants who had direct contact with Brennan. Ronald Herring, M.D., the Medical Director at Staton Correctional Facility, provided medical care to Brennan during the latter part of his incarceration at Draper. Herring Aff., Doc. No. 98-1, at 2-3. The court discussed in detail Dr. Herring's medical treatment and opinion in its order of July 7, 2016, denying Brennan's motion for preliminary injunction, where Brennan requested, among other things, "that the medical defendants 'cease and desist their cost saving custom and policy' and provide him adequate pain management and additional diagnostic testing/treatment, restore the chronic pain treatment of opiate-type pain medications previously prescribed by a neurological specialist, refer him to a pain management clinic for treatment, [and] refer him to a neurological specialist . . . ."[10] Doc. No. 103, at 1-2, 11. Because the court previously described the evidence from Dr. Herring, the court only briefly summarizes it here. Dr. Herring treated Brennan from August 2015 through December 2015, including Brennan's chronic pain. Doc. No. 98-1, at 5-13. In Dr. Herring's medical opinion, as Brennan's treating physician, it was best to treat Brennan's pain with Ultram 100 mg three times a day instead of Tylenol 3; Dr. Herring also increased Brennan's Gabapentin[11] to 600 mg three times a day and prescribed Baclofen as a muscle relaxant. Doc. No. 98-1, at 5-8. Dr. Herring considered whether to consult a neurosurgeon and ordered a check of Brennan's

---

[10] Brennan also asked for a "no-work profile," which he has since received. Doc. No. 103, at 2; Doc. Nos. 109, 116.

[11] Gabapentin is used to treat seizures and for pain relief. http://medlineplus.gov/druginfo/meds/a694007.html (last visited 8/16/17).

lab test results. *Id.* at 7-8. At a follow up visit, Brennan said only the tramadol helped to keep the pain tolerable, but it caused some incontinence. *Id.* at 8. Dr. Herring reordered Brennan's medications for pain and myospams, ordered more testing with the option to refer Brennan to a neurosurgeon, and directed Brennan to follow up for chronic pain issues. *Id.* at 9. At a follow up in December 2015, Dr. Herring discussed the testing results with Brennan, noting his case presented a "difficult situation with no obvious surgical" remedy, that he would continue to manage Brennan's pain and spasm, and that Brennan should follow up as needed. *Id.* at 12.

As of the date of Dr. Herring's affidavit, June 29, 2016, Dr. Herring felt Brennan's current medications of Tramadol, Baclofen, and Gabapentin three times a day were, in his professional opinion, suitable treatment for Brennan's symptoms. *Id.* at 12. He did not feel Brennan was a good candidate for surgery based on the objective tests performed and therefore did not need to be referred to a neurologist or neurosurgeon. *Id.* at 12-13. According to Dr. Herring, "Brennan's pain management is being treated adequately, responsively, and in Mr. Brennan's best interests, and therefore there is nothing in my opinion, a neurologist can offer Mr. Brennan that he is not being medically treated for at the present time by me as his treating physician. *Id.* at 13. Dr. Herring stated that Brennan's medical needs were never ignored or delayed, and he was seen on multiple occasions by various medical providers. *Id.* at 13-14. He stated Brennan has received limited profiles that have been provided to the ADOC. *Id.* at 14. Dr. Herring is personally familiar with Brennan and his medical treatment, and in Dr. Herring's professional opinion,

Brennan, at all relevant times, has been treated within the standard of care of physicians practicing medicine in Alabama. *Id.*

Brennan submitted an affidavit repeating his complaints that he should have been prescribed more powerful pain killers, that he suffered no ill effects from stronger pain medications, that Corizon and its medical providers decline to prescribe strong pain medication as a way to save money, that he suffered pain and withdrawal symptoms after his pain medications were stopped, that he should have been referred to medical specialists, that he should have received a no-work profile, and that he was forced to work even though it was clear he should not have been working. Doc. No. 52. Brennan submitted sworn statements from other inmates, including an inmate who was denied opioid pain killers for a chronic pain condition while in prison but was prescribed them after he was released, Doc. No. 122, and inmates who were determined to be disabled under the Social Security Administration but were denied a no-work profile in prison, Doc. Nos. 59, 60.

## IV. DISCUSSION

### A. Eighth Amendment Claims Against Defendants in Their Official Capacities

Brennan sues the defendants in their official capacities. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). State officials may not be sued in their official capacity unless the state has waived its Eleventh Amendment immunity or unless Congress has abrogated the state's immunity, and neither has occurred in this case. *See Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996) (discussing abrogation by Congress); *Pennhurst State School &*

*Hospital v. Halderman*, 465 U.S. 89, 100 (1984) (discussing Eleventh Amendment immunity); *Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (Alabama has not waived Eleventh Amendment immunity)).  In light of the foregoing, the defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for Brennan's Eighth Amendment claims seeking monetary damages from them in their official capacities.

### B. Eighth Amendment Claims Against Defendants in
### Their Individual Capacities

Brennan sues the defendants in their individual capacities for violations of the Eighth Amendment.  The defendants argue they are entitled to qualified immunity, which offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but rather immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (quotation marks and citations omitted) (alteration added).  To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that the defendants were acting within the course and scope of their discretionary authority when the incidents complained of

occurred. The plaintiff must, therefore, allege facts that, when read in a light most favorable to him, show that the defendants are not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, a plaintiff must show two things: (1) that a defendant committed a constitutional violation and (2) that the constitutional right a defendant violated was "clearly established." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quotation marks and citations omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). If Brennan cannot establish both elements to satisfy his burden, the defendants are entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241-42).

To prevail on a claim concerning an alleged denial of adequate medical treatment, a prisoner must, at a minimum, show that a defendant acted with deliberate indifference to the prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*,

792 F.2d 1052, 1058 (11th Cir. 1986). This standard requires a prisoner to "show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009). The inquiry includes objective and subjective components, and the prisoner must show "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255; *see also Farmer*, 511 U.S. at 837 (liability when defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"); *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

"A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *McElligott*, 182 F.3d at 1257. Not responding to complaints of pain or providing so little pain medication "as to amount to no care at all" constitutes a constitutional violation, and qualified immunity is unavailable to

such persons, who are "liable as if they had inflicted the pain themselves." *Id.* The length of delay and the reason for the delay matters, and even short delays are actionable if the medical need is sufficiently serious. *See Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010). A medical need is serious if it "'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Melton v. Abston*, 841 F.3d 1207, 1221-22 (11th Cir. 2016) (citations omitted). It also includes a medical need "'that, if left unattended, poses a substantial risk of serious harm.'" *Id.* at 1222 (citation omitted). "Severe pain that is not promptly or adequately treated can also constitute a serious medical need depending on the circumstances." *Id.* (citations omitted).

Medical malpractice does not rise to the level of a constitutional violation; instead, the standard is that of subjective, reckless disregard of an objectively substantial risk of serious harm to an inmate. *See Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999) (citations omitted). "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (alterations added) (citations omitted). "A difference in medical opinion does not constitute deliberate indifference so long as the treatment is minimally adequate." *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) (citing *Harris*, 941 F.2d at 1504-05); *Hamm*, 774 F.2d 1567, 1575 (11th Cir. 1985) (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *see also Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A

difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."). "[A]s *Estelle* teaches, the question of whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995). "Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records." *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) (citing *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990)); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (where video of high speed chase "utterly discredited" plaintiff's sworn account of the events, court could disregard plaintiff's sworn account because it was "blatantly contradicted by the record, so that no reasonable jury could believe it"); *cf. Joassin v. Murphy*, 661 F. App'x 558, 559 (11th Cir. 2016) (where self-serving declarations from defendants and defendants' colleagues were not "so inherently credible as to 'blatantly contradict[ ]' and 'utterly discredit[ ]' plaintiff's self-serving testimony, summary judgment for defendants was not warranted). Finally, any claim that specific medical procedures have been impermissibly delayed requires an inmate to put verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment. *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188-89 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

Deliberate indifference can include forcing an inmate to perform work beyond the inmate's strength or that is unduly painful. *See Buckley v. Barbour County, Ala.*, 624 F.

Supp.2d. 1335, 1348 (M.D. Ala. 2008). Prison officers are entitled to rely on the judgment of medical expert staff. *See Williams v. Limestone Cty., Ala.*, 198 F. App'x 893, 897 (11th Cir. 2006) ("supervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care"); *see also McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009) ("A prison official may rely on a medical professional's opinion if such reliance is reasonable."); *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) ("'Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.'") (citation omitted).

### 1. Medical Defendants

Brennan claims Corizon was deliberately indifferent to his chronic pain by denying or delaying care previously prescribed by a specialist, and denying adequate pain medication based on its policy "to cut costs as to narcotic medications distribution to" Brennan. Doc. No. 118, at 1. Brennan claims Dr. Copeland and Sagers-Copeland were deliberately indifferent to his serious medical needs, and they failed to intervene when he was forced to perform a job he was physically unable to do. Brennan claims that Hicks failed to intervene when Brennan was forced to work in a job that caused him pain and suffering. *Id.* at 2. Brennan further claims that Hallworth and Campbell also failed to intervene when other Corizon employees violated Brennan's Eighth Amendment violations, and when he was forced to work. *Id.* at 2-3.

### a. Defendants Dr. Copeland, Hicks, and Sagers-Copeland

Defendants Copeland, Hicks, and Sagers-Copeland do not specifically dispute in their affidavits Brennan's statement that Corizon has a policy not to prescribe strong narcotics except in cases of broken bones, cancer, or surgery. Nevertheless, even if Corizon has such a policy, it did not adversely affect Brennan's medical care based on the individual facts of Brennan's case, and based on this summary judgment record, no reasonable juror could determine that these defendants' treatment of him violated his Eighth Amendment rights.

### i. Pain

Brennan insists his previous doctors said he would need to be on painkillers for the rest of his life, but Brennan presents no such evidence from a medical professional that is contemporaneous with the events starting in July 2012. Brennan provides no verified medical evidence to establish the detrimental effect of the delay in his treatment. *See Hill*, 40 F.3d at 1188-89. Similarly, Brennan presents no medical evidence regarding the strength of the painkillers he states he needed. Brennan states he was in pain when he was not on Norco, but Brennan has come forward with no verified medical evidence explaining how strong Norco is compared to other pain medications, or that he received an unacceptable substitute, or that his medical needs while at Staton required strong pain medication. Brennan complains about the delay in receiving pain treatment, but the reason for the delay matters. *See Youmans*, 626 F.3d at 564. Dr. Copeland told Brennan at their first encounter in July 2012 that she needed time to decide what medications would be appropriate for him, and she took about a week to prescribe pain medications for him. Dr. Copeland avers that Ultram is used for short-term pain relief and "is not designed to be

utilized for long-term chronic pain issues." Doc. No. 32-1, at 4. It is undisputed that Brennan received no pain medication for approximately six weeks in the fall of 2012. But Dr. Copeland, along with other medical providers, knew of Brennan's complaints of pain, and Dr. Copeland "was attempting to alleviate Mr. Brennan's complains of chronic pain without complications from those medications." *Id.* When Hicks began caring for Brennan in 2013, she discussed his medical care with Dr. Crocker, and they concurred that a combination of Ultram and Parafon Forte were the best medications to treat Brennan at that time. Doc. No. 32-2, at 3. In 2015, Dr. Herring's professional medical opinion was that Brennan was best treated with a combination of Tramadol, Baclofen, and Gabapentin. Doc. No. 98-1, at 12. Defendant Sagers-Copeland was not responsible for providing medical care directly to Brennan, but she responded to Brennan's medical grievances, and she contacted care providers to ensure they were responding to his medical needs.

This court cannot second-guess the professional medical treatment Brennan received without more evidence that it was inappropriate. Brennan's medical case is complicated, but Dr. Copeland, Hicks, and many other medical care providers who are not named as defendants in this case worked with Brennan to control his pain. Brennan has come forward with no evidence to contradict the medical evidence in the record except his own statements that he had pain and that certain medications alleviated it. Brennan may have preferred different medications or referral to a specialist, but the undisputed medical records demonstrate that defendants Dr. Copeland and Hicks provided Brennan with continuous medical review and treatment. Whether medical personnel "should have employed additional . . . forms of treatment 'is a classic example of a matter for medical

judgment' and therefore not an appropriate basis for liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545-46 (quoting *Estelle*, 429 U.S. at 107); *see also Adams*, 61 F.3d at 1546 (inmate's allegation that his prison physician did not diligently pursue alternative means of treating condition "did not 'rise beyond negligence'. . . to the level of deliberate indifference") (citations omitted). The mere fact that medical personnel who treated Brennan elsewhere at a different time and differed in their opinions as to the appropriate course of treatment for Brennan does not, without more, constitute deliberate indifference. *See Garvin*, 236 F.3d at 898. Consequently, the record does not create a genuine dispute that Dr. Copeland's, Hicks, or Sagers-Copeland's treatment of Brennan, even if negligent, was so grossly inadequate "as to amount to no care at all" for a sufficiently serious medical need. *See McElligott*, 182 F.3d at 1257.

### ii. Withdrawal Symptoms

Brennan also claims the defendants violated his Eighth Amendment rights by causing him to suffer physical withdrawal from his pain medications. Courts have held that withdrawing from alcohol and opiates can constitute serious medical needs. *E.g.*, *Harper v. Lawrence Cty., Ala.*, 592 F.3d 1227, 1237 (11th Cir. 2010) ("our prior pronouncements on the illegality of delayed or inadequate treatment for alcohol withdrawal should have sufficed to put the supervisory Defendants on notice . . . that delayed or inadequate treatment of alcohol withdrawal would be unlawful."); *Foelker v. Outagamie Cty.*, 394 F.3d 510, 513 (7th Cir. 2005) (holding opiate withdrawal is serious medical need; and holding that social worker "might not have understood the severity of the situation and might have negligently believed that Foelker did not need additional medical attention. But

drawing all inferences in Foelker's favor, as we must at this stage, a reasonable jury could also conclude that she intentionally allowed Foelker to suffer from the effects of his withdrawal."). Brennan mentioned muscle spasms, nausea, hot and cold flashes, and insomnia, but it is unclear to what degree he experienced these symptoms. The defendants have stated they did not deny or delay any treatment for his serious medical needs, and Brennan has come forward with no verified medical evidence regarding the effects of withdrawing from Norco or the other drugs he received. He also has provided no verified evidence regarding accepted medical treatment for withdrawal from the drugs. *See Hill*, 40 F.3d at 1188-89. Dr. Copeland stated she was attempting to treat his pain without complications from the medications. Even drawing all inferences in Brennan's favor, based on this summary judgment record no reasonable juror could conclude that these defendants intentionally allowed Brennan to suffer serious effects of withdrawing from the medications. *See Harper*, 592 F.3d at 1237; *Foelker*, 394 F.3d at 513.

### iii. No-Work Profile

Brennan claims that these defendants also failed to issue him a no-work profile in violation of his Eighth Amendment rights. Dr. Copeland noted in November 2012 that Brennan did not cooperate with her exam of him and acted as if he could not even hold his arm out so she could test his arm and bilateral lower extremity resistance. Here, Brennan provides only his own statements regarding his abilities, and the observations of other individuals not trained in medicine, suggesting that Brennan could perform no jobs while he was at Draper. It is undisputed that Dr. Copeland, Hicks, and other medical care providers at Staton issued special needs profiles listing the work limitations that, in their

professional medical judgment, Brennan required. As Sagers-Copeland explained, medical providers did not control what jobs inmates were assigned—ADOC officials have that responsibility--but it was possible that an inmate's medical limitations precluded the inmate from working. To the extent that Brennan claims these defendants were deliberately indifferent to his serious medical needs by not issuing more work limitations, he does not create a genuine dispute of material fact precluding summary judgment.

### iv. Summary

Based on this summary judgment record, Dr. Copeland did not ignore Brennan's pain or related symptoms; she did not fail to treat them; she regularly reviewed his health including his complaints of pain; and she issued prescriptions, special needs profiles, and follow up treatment that she felt in her professional opinion was medically appropriate. Brennan's claim against Hicks does not concern the medical care she provided and instead challenges Hicks's failure to intervene when he said he could not perform his assigned job. It is evident that Dr. Copeland and Hicks rendered treatment to Brennan in accordance with their professional judgment. Similarly, Sagers-Copeland reviewed and responded appropriately regarding Brennan's medical care, as far as her responsibilities required. The record is therefore devoid of evidence, significantly probative or otherwise, showing that these defendants acted with deliberate indifference to Brennan's serious medical needs. Brennan has failed to present any evidence which indicates that these defendants knew that the manner in which they treated Brennan created a substantial risk to Brennan's health and that with this knowledge consciously disregarded such risk to his health or failed to intervene regarding Brennan's job. No reasonable juror could find in Brennan's favor on

his Eighth Amendment claims against Dr. Copeland, Hicks, or Sagers-Copeland, and they are entitled to judgment as a matter of law. *See Matsushita*, 475 U.S. at 587. Because summary judgment is due to be granted to these defendants on the Eighth Amendment claim, they are also entitled to qualified immunity. *See Hope*, 536 U.S. at 739.

### b. Defendants Hallworth, Campbell, and Corizon

Defendants Hallworth and Campbell held corporate leadership positions over Dr. Copeland, Hicks, and Sagers-Copeland. A supervisor may not be held liable solely on the basis of respondeat superior. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (citations omitted). Liability against a supervisor may be imposed only if a plaintiff shows the supervisor either personally participated in the alleged constitutional violation or instigated or adopted a policy that violated the plaintiff's constitutional rights. *Id.* at 1360 ("supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation").

Viewing the evidence in the light most favorable to Brennan, there is no showing on this record that Hallworth or Campbell actually knew about the alleged unconstitutional acts against Brennan. Although Brennan states he sent them letters, there is no evidence on this record that they received and read the communications instead of forwarding them on to the responsible party for response. Consequently, even if the actions of the other defendants amounted to an Eighth Amendment violation, Hallworth and Campbell cannot be individually liable for it. *See Cottone*, 326 F.3d at 1360.

In addition, there is nothing on this record that Hallworth, Campbell, or Corizon created or approved of a policy to limit strong pain medication for inmates that violated Brennan's Eighth Amendment rights. A private entity providing medical care to inmates may be directly liable under § 1983 if the action alleged to be unconstitutional is undertaken pursuant to that entity's policy or custom. *See Brennan*, 626 F. App'x at 943 n.2 (citing *Buckner v. Toro*, 116 F.3d 450, 452-53 (11th Cir. 1997)); *see also Salas v. Tillman*, 162 F. App'x 918, 922 (11th Cir. 2006) ("an official also may be liable where a policy or custom that he established or utilized resulted in deliberate indifference to an inmate's constitutional rights"). In Brennan's case before the Court of Appeals, it ruled that the district court erred in ruling that Brennan failed to state an Eighth Amendment claim that he was refused medication as a cost-cutting policy that left him suffering for eight hours a day. *Brennan*, 626 F. App'x at 944 (prisoner stated claim where "complaint alleged that [doctor] said he was limited in his ability to prescribe strong pain medication and that [care provider] authorized him to do so only for a time") (alterations added). Here, however, the case is not at that earlier stage but rather is at the summary judgment stage. As previously discussed, the defendants have come forward with medical evidence that Brennan's pain was appropriately treated. Although Brennan insists that Corizon has a policy of providing strong narcotics to prisoners only in cases of broken bones, cancer, or surgery, the undisputed records demonstrate that medical care providers knew about Brennan's injuries and pain, and that Brennan fails to create a genuine dispute whether he received constitutionally sufficient medical treatment. Accordingly, summary judgment is due to be granted in favor of Hallworth, Campbell, and Corizon.

## 2. ADOC Defendants

Brennan claims that ADOC officials Philyaw and Jackson denied Brennan his Eighth Amendment rights by forcing him to perform a job beyond his physical abilities. Brennan claims that Thomas, Naglich, Boyd, and Billups failed to intervene after becoming aware of the deliberate indifference to Brennan's serious medical needs and Brennan's forced work in a job beyond his physical abilities.

Billups managed the job board, and he responded to Brennan's request to be moved from the kitchen to the dorm by saying, "I've put you on the jobs board." Doc. No. 1-1, at 106. Billups, however, avers he was not involved in assigning Brennan a job. In any event, neither Philyaw nor Billups provided medical care to Brennan, and even assuming both knew about Brennan's medical complaints, they were not medical professionals, and they were entitled to rely on the professional judgment of medical care providers who issued the limited profiles regarding Brennan's ability to work. *See Williams*, 198 F. App'x at 897 ("supervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care"); *McRaven*, 577 F.3d at 981. Except for Brennan's own conclusory statements, and his statements about observations by other individuals with no medical experience, there is no evidence in the record to support Brennan's assertion that he could not perform the job of dining room worker or dorm cleaner. Brennan's conclusory statements are not enough to create a genuine dispute of material fact regarding these defendants' subjective beliefs about Brennan's serious medical needs or his ability to perform his assigned job. *See Holifield*, 115 F.3d at 1564

n.6 (conclusory assertions contrary to evidence in the record, in the absence of supporting evidence, are insufficient to withstand summary judgment).

Thomas, Naglich, and Boyd held supervisory roles regarding the other ADOC officials named as defendants. Viewing the evidence in the light most favorable to Brennan, there is no showing on this record these ADOC supervisors actually knew about the alleged unconstitutional acts against Brennan. Consequently, even if the actions of the other defendants amounted to an Eighth Amendment violation, these defendants cannot be individually liable simply based on their supervisory positions. *Cottone*, 326 F.3d at 1360; *Marsh*, 268 F.3d at 1035. In addition, there is nothing on the record suggesting that these defendants created or approved of a policy to limit strong pain medication for inmates or force them to work despite medical limitations. *See Salas*, 162 F. App'x at 922. Based on this record, Brennan does not create a genuine dispute whether these defendants were deliberately indifferent to his serious medical needs. *See Mann*, 588 F.3d at 1306-07.

No reasonable juror could find that any of the ADOC defendants consciously disregarded a substantial risk to Brennan's health by failing to intervene in his medical care or his job duties, or by forcing him to work beyond his physical limitations. Thus, no reasonable juror could find that the ADOC defendants were deliberately indifferent to Brennan's serious medical needs.[12] Defendants Philyaw, Jackson, Billups, Thomas, Naglich, and Boyd are therefore entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim. *See Matsushita*, 475 U.S. at 587.

---

[12] Because Brennan fails to show a constitutional violation, the ADOC defendants are also entitled to qualified immunity. *See Hope*, 536 U.S. at 739.

## C. ADA

With respect to Brennan's request for monetary damages from the defendants in their individual capacities for alleged violations of the ADA, "there is no individual capacity liability under . . . the ADA or RA." *Badillo v. Thorpe*, 158 F. App'x 208, 211-212 (11th Cir. 2005) (citation omitted); *Dale v. Moore*, 121 F.3d 624, 627 (11th Cir. 1997) ("[T]he ADA does not provide for individual liability[.]").  A private person may sue a public official in his official capacity for money damages under the ADA for conduct that *actually* violates the Fourteenth Amendment" *United States v. Georgia*, 546 U.S. 151, 159 (2006), but Brennan does not asserts facts suggesting the defendants actually violated his Fourteenth Amendment rights.  Thus, the defendants are entitled to summary judgment on Brennan's claim for damages for violation of the ADA.

## V. CONCLUSION

Accordingly, it is the ORDERED and ADJUDGED that the defendants' motions for summary judgment be and are GRANTED.

A separate judgment will issue.

DONE this 12th day of September, 2017.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE